## SEARS et al. v. TEXAS & N. O. RY. CO. *
### (No. 8257.)

(Court of Civil Appeals of Texas. Galveston. Dec. 15, 1922. Rehearing Denied Jan. 4, 1923.)

1. **Master and servant** ⊚137(4)—**No duty of engineer to look out for brakeman asleep on track.**

A locomotive engineer owes no duty to one asleep on or near the track, to keep a lookout for him, so that there was no negligence in not discovering him in time to avoid striking him, though he was a brakeman of another train, directed to signal certain other trains, not including that of said engineer.

2. **Negligence** ⊚59—**Injury actionable if reasonably anticipated.**

An injury is not actionable if it could not have been foreseen or reasonably anticipated as a result of the claimed negligence.

3. **Master and servant** ⊚137(4)—**Warning to train of danger no warning of brakeman being asleep on track.**

A signal so placed as to constitute a warning to passing trains of danger is no warning that the brakeman who placed it may be asleep on or dangerously near the track, so as to create a duty of an engineer towards the brakeman there asleep.

4. **New trial** ⊚102(1)—**Denial for newly discovered evidence not an abuse of discretion, in absence of showing of diligence.**

In the absence of a showing of diligence before trial, there was no abuse of discretion in refusing new trial for newly discovered evidence, consisting of a rule of defendant; defendant's book of rules having been produced in court for the trial at request of plaintiff's counsel.

Appeal from District Court, Harris County; Ewing Boyd, Judge.

Action by Mrs. Nolia Sears and others against the Texas & New Orleans Railway Company. Judgment for defendant, and plaintiffs appeal. Affirmed.

Garrison & Watson, of Houston, for appellants.

Baker, Botts, Parker & Garwood, Charles Murphy, J. G. Donovan, and Woods, King & John, all of Houston, for appellee.

LANE, J. This suit was brought by appellant, Mrs. Nolia Sears, as temporary administratrix of the estate of Eugene Pierce Sears, deceased, with an alternative suit for herself, as next friend for the minor children of herself and the deceased, against the Tex-

---

⊚For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted January 31, 1923.

as & New Orleans Railway Company for damages occasioned by the death of the said Eugene Sears.

The plaintiff alleged that the deceased met his death on the 29th day of July, 1920, by being struck by a train of the defendant while he was in discharge of his duties as a brakeman on a freight train of the defendant. She alleged that the death of the deceased, Eugene Sears, was the direct and proximate result of the negligence of the defendant, its agents, servants, and employees, in the following particulars:

"(a) The failure of the engineer and fireman in charge of said locomotive to maintain and keep a lookout for signals, and deceased and other flagmen that might be on said track.

"(b) In approaching said point where said lantern had been placed, as aforesaid, and in violation of the rules of the defendant company without slowing down said train and bringing same under control.

"(c) In running said train at said time and place and under said circumstances, at a high, dangerous, and unlawful rate of speed.

"(d) In failing to blow the whistle, ring the bell, and to use such other means as was at the command of said engineer and fireman to attract the attention of deceased to the approach of said train.

"(e) In continuing to operate said train at a high, excessive, unlawful, and dangerous rate of speed after the said engineer and fireman in charge of said engine discovered and realized the perilous position of deceased, and without taking any steps to prevent injuring and killing him after such perilous position of deceased was discovered and realized, which they could and should have done with the means at their command, and with perfect safety to said engine and train, and the employees and passengers thereon.

"(f) In failing to stop the train before reaching said red light, which was on said track, as aforesaid, and in easy view of the engineer and fireman in charge of said locomotive, as was their duty so to do under the rules and customs of defendant company, and all other railroad companies, which red light, under such rules and custom, was a sign and warning to them to stop said locomotive and train before reaching said light; notice here now given to the defendant company to produce upon the trial of this case the rules of said company pertaining to the use of red lights on such occasions.

"(g) In failing to so slacken the speed or stop the train when the engineer and fireman in charge of said locomotive and train saw and realized, or in the exercise of ordinary care should have seen and realized, the dangerous and perilous position of deceased, and which by the use of the means at their command, consistent with safety to said locomotive and the employees and passengers thereon, the engineer and fireman in charge thereof could have so stopped the same as to have avoided injury to the deceased."

The defendant answered by general demurrer, general denial, and by a general plea of contributory negligence and assumed risk on the part of the deceased.

It was shown that on the 28th day of July, 1920, a certain freight train of the Texas & New Orleans Railway Company, transporting an interstate shipment, left Echo, a station in Texas, of said railway company, at 12 o'clock in the night; that it was going west, and reached Liberty, Tex., about 5 o'clock the next morning; that one Kemp Thompson was the conductor in charge of said train, and that the deceased, Eugene Sears, was a brakeman thereon; that when the train reached Liberty it was divided into two sections, one section was set out on a passing track about one mile west of Liberty, and that the other section thereof was, taken, in charge of the conductor, west to the town of Dayton, about 7 miles distant. The deceased, Eugene Sears, was left at the passing track of Liberty, where a part of the train was set out, with instructions to hold all trains, except first-class trains, which might be going west, by flagging them, until the engine which had taken the other part of the train west to Dayton had returned to Liberty.

Passenger trains are known and called first-class trains. A passenger train, known as No. 101, was due to arrive at Liberty at 6:18 o'clock. Sears was told by the conductor to protect the engine, which had pulled a part of the train to Dayton, on its return to Liberty against all trains going west, except first-class trains; he was not to protect it against passenger train No. 101; he was not to flag that train; it had the right of way, and the conductor was not to leave Dayton on his return to Liberty until No. 101 had passed Dayton; Sears knew he was not not to flag No. 101; he was not left there to stop this No. 101 train. Sears went to sleep near the railway track, and as he started to get up train No. 101 struck and killed him. It was broad daylight when No. 101 struck Sears; the sun was up.

Conductor Kemp Thompson, witness for plaintiff, testified that he left the deceased with that part of his train which was left at Liberty; that when he left him Sears had two lanterns, one red and the other white; that the red lantern was used to signify danger; that they carry red lanterns, torpedoes, and red flags to warn trains of danger; that they used torpedoes for protection of trains; if one torpedo is put on the track and is run over by the engine, the engineer is to stop, and if he runs over two he is to slow down and look out for signals; the two exploding torpedoes mean caution; that if the engine explodes one torpedo, the engineer is warned that there is danger ahead and for him to stop at once, and if he explodes one and goes 200 or 300 feet further and explodes another, he is warned to put the train in slow, that is, to have the train under control, so that if one torpedo is exploded that means stop the train, unless the second is exploded; the second explosion means to bring the train under control, that there may be something down

ahead of you; that it was the duty of Mr. Sears, if he wanted to stop a train, to put out torpedoes; that he could have put out two torpedoes as a caution, or only one if he wanted to stop the train; that it was his duty, if he wanted to protect that passenger train, to have it slow down, to put out torpedoes; that a red lantern in front of a train, however, would indicate that there was danger, independent of torpedoes; that the white lantern left with Sears is used by railroad men to work with—give signals; that the place for the red lantern as a warning of danger is on the side of the track.

From the point where Sears was struck toward the east the railroad track was straight for nearly a mile, and the view of those on the engine was in no way obstructed between these points; there are several cattle guards intervening, but they would not obstruct the view of enginemen; he found glass like that of the globe of the red lantern left with Sears at the point where he was struck; the frame part of the lantern, picked up at the place where Sears was struck, was mashed up like it had been hit by a train or something; that he could not say whether this was the frame of the red lantern or white lantern, but there was red glass at said point; that the place occupied by the engineer on the engine is about 8 feet above the track and there are windows in the front of the engine cab, so situated as to allow the enginemen to see the track ahead of them.

Charley Helms, witness for plaintiff, testified to finding the red glass and frame of a lantern at the point where Sears was killed, as did Conductor Thompson; he also corroborates the testimony of Thompson as to the straight, unobstructed track for a mile on approaching the point of the accident from the east. He testified that at the point of the accident there were only two railroad tracks, the main line and a passing track south of the main line; that there were some weeds and grass along the side of the track that were higher than the track, but they would not obstruct the sight of the track by the enginemen.

Witness Matt Richardson, for the plaintiff, testified that he lived on the south side of the railroad opposite the point where Sears was killed, and about 50 or 55 feet south of the main line track; that there were two other houses close to his, one on each side of his; that Wiley Pauldo lived in one and Bill Hooey in the other; that the track for same distance from the point of the accident to the east seemed to be unobstructed by anything so as to prevent the enginemen from seeing down the track for a mile; that he saw Sears just before he was struck and killed. Testifying further, he said:

"When I first went out on my front gallery I saw a man lying down. His head was pointing a little northeast. He was lying still, just like a person asleep. I saw him first just as I opened my front door and started to walk out on the gallery. He was on the main line, but was lying between the main track and the switch, and he was on the same side of the track that my house was on. When I first saw the man lying there, I called to Wiley Pauldo, and asked him if he saw the man lying there on the track, and we then hollered to the man to try to wake him up, and in a minute or two we heard the train approaching, and we tried to wake him up again by calling to him, but he did not pay any attention to us. * * * There was a lantern sitting by him. As to whether there was any one else who saw the man before he was struck, why, there was no one who saw him except Wiley Pauldo and myself, as far as I know anything about. Wiley was on his gallery, and also ran to the fence when the man was lying there.

"As to the location of the locomotive engine, with reference to the town of Liberty, when I first saw the man lying to the side of the track, why, when I first went out on the gallery I did not see or hear the train coming from towards Liberty, but I then went back in the house to put on my clothes and I heard the train whistle for the Pickett crossing, which is about a third of the way from the depot at Liberty to my house; and I then went on the gallery again, and the train was about a half a block from where the man was lying down. The locomotive was pulling a passenger train. As to how many cars or coaches were attached to the locomotive, I cannot tell you, but it was a pretty long train. It was running fast. I never heard any whistle or bell, or any other unusual noise, such as is usually given to frighten stock or any one that might be on the track or approaching the track ahead of the engine. If there were any, I didn't hear them, as I was nervous and excited. As to whether the engine or train appeared to slow down any from the time I first saw it until after it struck the man, it didn't seem to slow down to me. I did see the engine strike the man. Just before the train reached him, he tried to get up, but before he had time to straighten up, the train had hit him. * * * I don't know how far the train ran after hitting the man, but I do know that all of the train had passed my house before it stopped. * * * I have been living by the side of the track there for the past 10 years, and I was living there on July 29, 1920.

"Regarding the speed of the train, as compared with how trains usually and customarily run by my place at that point—whether slower or faster, or about the same speed that passenger trains usually run by my place—why, it was running at about the same speed.

"As to whether the lantern appeared to be lighted or unlighted, it looked red to me, and it looked as though it was lighted. I say, it looked as though it was lighted, because the lantern showed a red light, or something like it, and the way it showed up it must have been lighted. It was after sunup when the man was struck by the train. I cannot say exactly how long the sun had been up or how high it was at said time, but it had been up for some little time. As to whether it was a clear morning or a foggy morning I could not say positively, but I believe it was a clear morning. * * * "The man's head was lying about a foot or so

from the rail, and I believe his head was on or near the end of the ties. I could not say whether he was lying so near the rail that a train passing on the track at the time would have struck him, or not."

He testified, further, that if the man heard him and Pauldo calling to him he did not move until the train got close to him, and then he raised up, and before he could get straightened up the train struck him.

On cross-examination this witness repeated his testimony given on direct examination, and in addition thereto he testified that the man (Sears) was lying between the main line and the side track with his head pointing a little to the northeast, which was near the main line track; that he could not say whether the lantern he saw was sitting between the main line and the side track, but that it looked to him as though it was on his arm, and that his arm was lying right up to or against the rail; that his arm might have been lying across the main track.

Witness Zack Mickens, testifying for plaintiff, said there were several cattle guards between the depot at Liberty and the point of the accident, but that he saw nothing that would obstruct the view of the enginemen.

Howard Davis, for plaintiff, testified that he saw two lanterns at the place where Sears was killed, a red one and a white one, but he did not see these lanterns nor the man until after he was killed; that the lanterns were both mashed up; that the train that struck Sears was running about the usual speed of passenger trains.

Wiley Pauldo, for the plaintiff, testified on direct examination, in part as follows:

"I do not know where the man, Eugene Sears, was when he was killed. I lived about 40 feet from the place where he was killed. I did not see the man prior to the time he was killed. He was between the main line and the side track, and he was lying down. His feet were pointing southwest and his head north. It is a fact that at the time he was killed it was broad daylight, and the sun was up.

"I saw two lanterns near the man at the time he was killed. Both lanterns were setting just inside the south rail of the main line. I could not say whether said lanterns were burning or not. I was standing in the door of my house just south of the track where the man was killed, and I could not tell whether the lanterns were burning or not. I could only see the top part of the lanterns, on account of the south rail of the main line track obstructing my view.

"I saw the man jump up just before he was struck. He was lying between the main line and the siding, and was between the tracks. The engine was within about 20 feet of the man when he got up, and by the time he had straightened up the bumper on the side of the engine hit him. With reference to how close his head was to the end of the ties, it was clear of the end of the ties about 18 inches. As to how close his feet were to the end of the ties, they were pointing southwest, and his feet

were further away from the main line than his head was; his head was near the main line.

"The first time I noticed the man on the track was shortly before he was struck, when one of the neighbors hollered to me that there was a man lying on the track, and asked me if he wasn't dead. I replied, 'No,' that 'he is a brakie. Don't you see his lanterns?' I then laid down, and was shortly aroused again by the same neighbor hollering to me that the train was coming, and that the man had not got up. I then got up, and the train had just blowed for the last crossing before reaching the river, and I tried to dress to go out and wake the man, but saw that I would not have time, and I then opened the door and hollered, 'Hey!' just as loud as I could, but I failed to wake him, and about that time the train woke him, and as he was straightening up the side of the engine struck him."

On cross-examination he testified that the train that struck Sears was running about 30 miles an hour, the usual speed of passenger trains.

Witness T. L. Walker, for plaintiff, testified that he had been a locomotive engineer for 8 years; that within his knowledge a passenger train, such as the one in question, while running at a speed of 30 miles an hour, properly equipped, and with safety to the train and its passengers, could be stopped within 400 or 500 feet.

Witness L. G. King, for the plaintiff, testified shortly after the accident to Sears he examined the track between the depot at Liberty and the point of the accident, and that there was nothing to prevent the enginemen from seeing the red lantern or body of Sears lying beside the track, for a much greater distance than 600 feet.

Counsel for defendant, upon demand therefor, produced the rules of the railway company and introduced in evidence the following:

"(a) A yellow flag by day and a yellow light by night indicates that trains must run slowly and under control, until a green flag or green flag and light is reached. These signals will be placed to the right of the track in the direction of movement."

And at this point counsel for plaintiff introduced the following rules:

"Visible Signals.

"Color Signals.

| Color. | Indications. |
|---|---|
| (a) Red. | Stop. |
| (b) Green. | Proceed, and for other uses prescribed by the rules. |
| (c) Yellow. | Proceed with caution, and for other uses prescribed by the rules. |
| (d) Green and white. | Flag stop. See rule 28. |
| (e) Blue. | See rule 26. |

"(a) A yellow flag by day and a yellow light by night indicates that trains must run slowly and under control until a green flag or green

flag and light is reached. These signals will be placed to the right of the track in the direction of movement.

"Rule 9. *When Night Signals are to be Displayed.* Night signals are to be displayed from sunset and sunrise. When weather or other conditions obscure day signals, night signals must be used in addition."

The foregoing is substantially all the material evidence.

The cause was tried before a jury. The court charged the jury as follows:

"(1) You will for your verdict in this case answer, from the evidence, the special issues herein submitted to you, writing your verdict on a separate sheet of paper, which will be furnished you, to be signed by your foreman, whom you will select from your number.

"You are the exclusive judges of the facts proven, and, in passing on such facts, of the weight of the evidence and the credibility of the witnesses, but the law will take from the court, as herein given, and be governed thereby.

"(2) The burden is upon the plaintiff to prove by a preponderance of the evidence the facts alleged in her petition as submitted to you herein, and, unless you should find that the plaintiff has discharged such burden of so establishing the issues submitted to you herein, it will be your duty to answer such issues against the plaintiff. The issues submitted may be established by circumstantial evidence, as well as by direct testimony, and the burden is upon the plaintiff in either event to establish by a preponderance of the evidence the affirmative of the issues herein submitted.

"(3) 'Negligence,' as that term is used in this charge, in its legal significance, is a want of ordinary care, and by 'ordinary care' is meant such care as a person of ordinary prudence would use under the same or similar circumstances.

"(4) 'Contributory negligence,' as that term is used in this charge, in its legal signification, is an act or omission on the part of the injured party, which an ordinarily prudent person would not have done, or failed to do, under the same or similar circumstances, and which, either alone or concurring with negligence of the defendant, becomes a proximate cause of the alleged injuries.

"Under the above definition, you are instructed that Eugene Pierce Sears was guilty of contributory negligence under the facts and circumstances, as a matter of law.

"(5) 'Proximate cause,' as that term is used in this charge, in its legal signification of an injury, is a cause without which the injury would not have happened, and from which the injury, or some like injury, might reasonably have been anticipated as a natural or probable consequence.

"(6) Now, bearing in mind the foregoing instructions, you will answer the following special issues:

"Special issue No. 1: Did the agent, servants, and employees of the defendant, operating the locomotive which struck and killed Eugene Pierce Sears, see and know that said Sears was a person lying near the track, and realize his perilous position, and that he was not undertaking to extricate himself therefrom, in time, with the means at their command and in safety to said train and its passengers, to have stopped said train in time to have avoided striking and killing said Sears? You will answer said issue Yes or No, according as you find the facts to be.

"Special issue No. 2: At the time the train which struck Eugene Pierce Sears was approaching the scene of the accident, was there displayed on the main track at the scene of the accident the red lantern danger signal defined by the rules of the defendant as such? You will answer this issue Yes or No, according as you may find the facts to be. If you have answered special No. 2 in the affirmative, and in that event only, then you will answer:

"Special issue No. 3: Did the agents, servants, and employees of defendant operating the locomotive which struck said Sears see said danger signal in time to have stopped said train with the means at their command and in safety to the train and its passengers, before running over said signal? You will answer Yes or No, according as you find the facts to be."

The jury answered the first issue in the negative, the second in the affirmative, and the third in the negative.

They also found that the loss to the plaintiffs by reason of the death of Eugene Sears was $20,000.

Upon the answers to questions 1, 2, and 3, and upon the evidence, the court rendered judgment for the defendant.

There were other questions propounded to the jury which were to be answered only in the event the answers to question No. 3 was answered in the affirmative; therefore it is not necessary to set out such questions.

No complaint is made to the action of the court in instructing the jury that the deceased was, as a matter of law, guilty of contributory negligence, nor to the finding of the jury that the enginemen did not discover the peril of the deceased in time to prevent the accident. These matters are not therefore presented for our consideration, but in view of the admitted fact that the train which struck and killed the deceased contained an interstate shipment, appellant contends that under such admitted fact, under the provisions of section 3 of the Federal Liability Act, approved April 22, 1908 (U. S. Comp. St. § 8659), the plaintiff may recover from the defendant upon a showing that the death of Eugene Sears was the result of the negligence of the servants and employees of defendant in charge of the train which struck him, in not keeping a proper lookout for danger signals and for persons who might be on or near the railroad track, notwithstanding that under the laws of the state of Texas proof of contributory negligence on the part of the deceased would constitute a perfect defense to plaintiff's suit. By the act above referred to it is provided:

"That in all actions hereafter brought against any such common carrier by railroad under or by virtue of any of the provisions of this act to recover damages for personal injuries to an

employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee."

Under this view of the law governing the present case, appellants insist that the court erred in refusing to submit to the jury, upon their written request therefor, the following questions: First, would the servants in charge of the locomotive that struck Sears, in the exercise of ordinary care in keeping a reasonable lookout, have discovered Sears and realized that he was a person, and that he was in a perilous position, and that he was not attempting to extricate himself therefrom, in time to have stopped the train with the means at hand and in safety to the train and its passengers, before striking Sears; second, would such servants by the exercise of such care have discovered the danger signal (the lantern) on the railroad track in time to have stopped said train with the means at their command and in safety to the train and its passengers before striking Sears; and, third, was the failure on the part of such servants to exercise such care a proximate cause of the death of Sears? We shall dispose of these contentions in the order named.

[1] Whether the court erred in not giving the instruction first mentioned depends upon whether there was any duty imposed upon the servants of the defendant in charge of the engine which struck Sears to keep a lookout for him as he slept on the railroad track. In other words, was the failure of the enginemen to see Sears, where was lying on or near the track, in time to avoid the accident, when by looking out they might have seen him, legal or actionable negligence upon which a cause of action can be based? If so, such failure was a proximate cause, and would render the defendant liable. We have, however, reached the conclusion that there was no duty imposed upon said enginemen to keep a lookout for Sears as he slept on the track, and therefore the court did not err, as insisted by the first contention. Judge Taft, now a judge on the Supreme Bench of the United States, in the case of Newport News & M. V. Co. v. Howe, 52 Fed. 362. 3 C. C. A. 121, while Circuit Judge, said:

"When a man lies down to sleep upon a railroad track, * * * with full knowledge that a train is soon to pass that way, does he thereby impose upon the engineer the duty with respect to him of keeping a lookout, and of discovering him upon the track? It is true that the engineer owes it to the passengers on the train, and to persons lawfully upon the track, to keep a lookout, in order to prevent injury to them. But that is because danger to such persons is probable, and should be looked for, to be avoided. One is bound to use one's own so as not to injure another. This duty, of course, is commensurate with the reasonable probability that any particular use of one's own will injure another. Now there is no probability that a man will be asleep upon the railroad track. While, therefore, an engineer who fails to keep a sharp lookout upon the track is wanting in due care to passengers and lawful travelers, because of the probability of danger to each from such failure, such conduct is not a want of due care with respect to a man asleep on the track, because of the presumption upon which the engineer has a right to rely, that no one would be so grossly negligent in courting death. As there was no duty imposed upon the engineer to look out for the sleeping man, there was no negligence in his failing to see Howe. It would follow that the engineer's failure to learn the peril earlier was not a proximate cause of Howe's injury."

It is urged by appellants that the statement of Judge Taft above quoted from the Howe Case was not necessarily involved in that case, and that the same was therefore mere dictum. An analysis of that decision leads us to the conclusion that the statement is pertinent to the issues involved, and not mere dictum. But independent of its applicability to that case, we think the conclusions there announced are sound.

In R. C. L. vol. 20, § 7, p. 9, it is said:

"In explanation of what constitutes negligence, the statement frequently is made that negligence is a failure to exercise the degree of care demanded by the circumstances; and even more frequently it is asserted that negligence is a failure to observe a legal duty, and that where there is no duty no legal liability can arise on account of negligence. Mr. Chief Justice Bigelow, of the Massachusetts court, once said: 'In order to maintain an action for an injury to a person or property by reasons of negligence or want of care, there must be shown to exist some obligation or duty towards the plaintiff, which the defendant has left undischarged or unfulfilled. This is the basis on which the cause of action rests. There can be no fault or negligence or breach of duty where there is no act or service or contract which a party is bound to perform or fulfill.'"

[2] An injury is not actionable if it could not have been foreseen or reasonably anticipated. "Negligence presupposes a duty of taking care, and this in turn presupposes knowledge, or its equivalent. Mischief, which could by no reasonable possibility have been foreseen, and which no reasonable person would have anticipated, cannot be taken into account as a basis upon which to predicate a wrong." R. C. L. vol. 20, § 9, p. 13, and authorities there cited; Light & Power Co. v. Lefevre, 93 Tex. 604, 57 S. W. 640, 49 L. R. A. 771, 77 Am. St. Rep. 898; section 41, vol. 20, R. C. L.; Denman v. Railway Co., 26 Minn. 357, 4 N. W. 605.

[3] Nor do we think the court erred as asserted by the second contention. The only conclusion deducible from the evidence is that if Sears placed a red lantern upon the main line track it was by accident, as he

was told not to interfere with the passenger train No. 101, which he knew was to pass by him in a very short time. It is therefore reasonably certain that if the red lantern was placed in such position as to constitute a warning of danger to passing trains, it was so placed by accident while Sears slept. However, if it be conceded that the red lantern was placed by Sears in the proper place to give warning of danger to the engineer, it must be further conceded that it was so placed to warn those in charge of an approaching train of danger to said train and its passengers and of the danger to trains ahead. It certainly was not intended to be, nor was it in fact, even a remote warning that the brakeman who set the warning was or could probably be asleep on the track or so near thereto as to be struck by the engine; no such danger could have been reasonably anticipated by the engineer had he seen the warning signal. As already stated, an injury is not actionable if it could not have been foreseen or reasonably anticipated. And, again, to constitute an act or omission the foundation of an action at law, it must appear that a duty was due from the actor to the person claiming to have been injured by the act. In vol. 20, § 41, R. C. L., this rule is stated:

"To authorize a recovery on the ground of negligence, it must be made to appear that the obligation of taking active measures to discover the peril and prevent an injury therefrom was one due from the defendant to the person injured. It is not sufficient to show that the defendant owed to another person or class of persons a duty, which had it been performed would have prevented the injury complained of. Said a thoughtful judge in one of the more recent cases: 'It has usually been held that facts which create a relation and therefore a duty as to one do not establish the same obligation to all mankind. To be within the right created, the complaining party must show facts which made the reason for claiming a relation applicable to him. The proposed rule is an abandonment of this idea and seeks to make the obligation to use care, which springs from the relationship, a duty owed to everybody who by chance comes within the range of the influence of the act complained of. The argument is that since the act is one the defendant should have refrained from doing, it is just that he be responsible for all its consequences. But this is a partial view of the situation only. The act is not wrongful in itself. Its wrongfulness is found in its probable effect upon others who are in some relation to the actor. Remove these related parties from the situation and the act is entirely lawful, As to the unrelated parties the happening is a pure accident.' For example, the duty owing from a master to his servant to provide safe instrumentalities and places can furnish no basis for a recovery by one whom the master has not accepted into his service."

This rule is supported by numerous authorities cited thereunder.

It is clear from what we have already said that we have reached the conclusion that the supposed negligence could not have been a proximate cause of the death of Sears, and therefore appellants' third contention is overruled without further comment.

[4] We also overrule appellants' contention that the court should have granted their motion for a new trial, upon their showing that since the trial of the case they had discovered new evidence material to the prosecution of their suit. It is not shown what diligence, if any, appellants or any one for them used to learn whether the alleged new evidence existed before the trial of the case. The evidence alleged to have been discovered was a rule of the defendant railway company requiring the enginemen to keep a lookout for signals, etc. The evidence shows that at the request of counsel for appellants the book of rules of the defendant was produced in court. Under the showing made, the trial court was clothed with the discretionary authority to overrule the motion for new trial. We do not think there is any showing that such discretion of the trial judge was abused.

Having reached the conclusion: First, that under the undisputed evidence and the law above stated it is apparent that no duty was resting upon the enginemen to keep a lookout for Sears, who, contrary to all reason and in utter disregard of his own safety, went to sleep on or so near the railroad track as to be injured or killed by a train which he knew was scheduled to pass the point where he slept in a very short time; second, that the act of the enginemen in running past the signal of danger, indicating danger to their train and in no manner indicating that if such signal was passed any such or similar accident as did happen might reasonably occur; and, third, that under such evidence and law a failure, if any, of the enginemen to keep a lookout for Sears, or the danger signal, was not the proximate cause of the death of Sears—we affirm the judgment.

Affirmed.